IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 9:19-cr-00542-DCN-1 |
| vs. | ) | |
| | ) | **ORDER** |
| ELI SCRUTCHINS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court on defendant Eli Scrutchins'

("Scrutchins") motion to suppress statements, ECF No. 54, and motion to suppress

evidence, ECF No. 57. For the reasons set forth below, the court denies the motions.

## I.  BACKGROUND

On March 19, 2019, a man wearing a black hoodie, black pants, a black mask, and

a black hat entered the South State Bank in Hardeeville, South Carolina, pointed what

appeared to be a firearm at the tellers, and demanded money. A teller handed the man

more than $12,000 in cash, after which the man fled. A security camera showed the

direction traveled by the suspect as south toward an abandoned building. Officer F.

Lemus with the Hardeeville Police Department ("Officer Lemus") responded to the

report of armed robbery and arrived at the scene immediately after the robber had fled the

bank. An employee of the bank pointed Officer Lemus in the direction that the suspect

fled, towards the abandoned building.

Within seconds, Officer Lemus located a black male wearing a blue shirt and

black pants behind the abandoned building the suspect had fled towards. As Officer

Lemus exited his vehicle to speak with the man, the man entered a black Kia Forte and

fled the area. A vehicle pursuit ensued, with the vehicles traveling southbound into

Georgia on Interstate 95.  According to the government, motorists on Interstate 95 called in the Kia Forte for reckless driving and signaled out of their car windows to assist Officer Lemus in his pursuit of the Kia Forte.  According to Scrutchins, Officer Lemus did not maintain visual contact with the fleeing car, and, during the chase, stopped a blue sedan that he believed to be the suspect car, exited his vehicle with his gun drawn, and then returned, reporting it was the wrong vehicle.

The Kia Forte drove through the Georgia welcome center, re-entered Interstate 95, and struck a semi-truck, causing the airbags to deploy and major damage to the front end of the Kia Forte.  The driver was ordered out at gunpoint by Officer Lemus and identified as Scrutchins, a black male wearing a blue shirt and black pants.  Officer Lemus identified Scrutchins as the same man he had seen behind the abandoned building near the bank and who had fled in the black Kia Forte.  After backup officers arrived, Scrutchins was handcuffed and remained next to the car while law enforcement worked the scene.  Scrutchins was not read his Miranda rights at the scene of the crash.  Officers asked him general questions about whether he had a gun, whether he was hurt during the accident, whether he was comfortable, and where officers could locate his identification and wallet.

While at the scene of the crash, Scrutchins made certain statements tending to link him to the armed robbery, including "God he got to me fast"; "38 seconds inside, 29 seconds to my car, how the fuck did he get to me so that fast?"; "Less than a minute and a half.  That's impossible.  You should be at Bojangle's and not get to me in a minute and a half."; and "48 seconds to the highway, 5 minutes and 8 seconds out of the state.  It's impossible.  It's the biggest fluke ever."  ECF No. 64.  Also at the scene of the crash,

officers opened the doors and trunk of Scrutchins' vehicle and observed in plain sight a

black backpack matching the one worn by the armed robbery suspect. Officers closed the

trunk without opening the backpack or conducting a hand search.

The Port Wentworth Police Department took Scrutchins into custody and charged

him with reckless driving. The Kia Forte was towed and securely stowed inside the

Hardeeville Police Department. Corporal Jeff Crosby ("Detective Crosby") prepared an

affidavit in support of a search warrant for Scrutchins' vehicle, and that search warrant

was approved by South Carolina Circuit Judge Carmen Mullen on March 20, 2019. ECF

No. 57-1. Upon execution of the search warrant, officers found in Scrutchins' vehicle,

inter alia, a black handgun with a silver barrel, various items of clothing, a backpack that

contained $12,172 in U.S. currency, and several items and documents in the name of Eli

Scrutchins, including the vehicle registration. The exploded dye back and all ten of the

twenty-dollar bait bills a teller had hidden amongst the money she handed to the armed

robbery suspect were also in the backpack.

On June 11, 2019, a grand jury indicted Scrutchins on three charges: (1) armed

robbery, in violation of 18 U.S.C. §§ 2113(a) and (d); (2) possession of a firearm in

furtherance of a crime, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and (3) possession of

a firearm as a felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e). On

June 25, 2019, Scrutchins entered a plea of not guilty.

On May 28, 2021, Scrutchins filed a motion to suppress statements. ECF No. 54.

On June 25, 2021, the government responded, ECF No. 58, and on July 22, 2021,

Scrutchins replied, ECF No. 64. On June 22, 2021, Scrutchins filed a motion to suppress

evidence. ECF No. 57. The government responded on July 14, 2021, ECF No. 62, and

Scrutchins did not file a reply.  The court held hearings on the motions on October 12,

2021 and January 6, 2022.  ECF Nos. 69 & 72.  During the January 6, 2022 hearing, the

court requested supplemental briefing.  On January 7, 2022, the government filed its

supplemental briefing, ECF No. 71, and on January 12, 2022, Scrutchins filed his, ECF

No. 74.  As such, these motions are now ripe for review.

## II.   DISCUSSION

Scrutchins moves to suppress all statements that he made during his encounter

with police on the grounds that such evidence was obtained in violation of his right

against self-incrimination.  He also moves to suppress all evidence seized pursuant to the

state search warrant obtained on the grounds that the evidence was obtained in violation

of his Fourth and Fifth Amendment rights.  The court addresses each motion in turn.

### 1.   Motion to Suppress Statements

First, Scrutchins moves to suppress all statements he made during his encounter

with police as obtained in violation of his Miranda rights.  A suspect in custody "must be

warned prior to any questioning that he has the right to remain silent, that anything he

says can be used against him in a court of law, that he has the right to the presence of an

attorney, and that if he cannot afford an attorney one will be appointed for him prior to

any questioning if he so desires."  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  The

special procedural safeguards set forth in Miranda, however, apply only when a suspect is

both in custody and subject to interrogation.  See Rhode Island v. Innis, 446 U.S. 291,

300 (1980).  "Volunteered statements of any kind are not barred by the Fifth Amendment

[right against self-incrimination] and their admissibility [is not implicated by Miranda]."

Id.

4

"A person is 'in custody' for purposes of <u>Miranda</u> either if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest." <u>United States v. Sullivan</u>, 138 F.3d 126, 130 (4th Cir. 1998). The key question is whether, viewed objectively, "a reasonable man in the suspect's position would have understood his position" as being "in custody." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 422 (1984). A person is subject to interrogation when the person is "subjected to either express questioning or its functional equivalent." <u>Innis</u>, 446 U.S. at 300–01. "Functional equivalent" is defined to include "any words or action on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301. "<u>Miranda</u> does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." <u>United States v. Rhodes</u>, 779 F.2d 1019, 1032 (4th Cir. 1985) (internal quotation marks omitted).

The government does not dispute that Scrutchins was in custody at the time of his statements and had not yet been read his <u>Miranda</u> rights. ECF No. 39 at 10–11. Thus, the crux of the parties' dispute is whether Scrutchins was subjected to a police interrogation. The court finds that he was not.

Scrutchins contends that his statements were a product of police interrogation. Specifically, he maintains that "[a]ll of his statements came after [] repeated questions involving the robbery," including questions about the car chase and whether Scrutchins had a gun. Upon review, the court finds that video evidence does not support Scrutchins' version of events, but rather shows that no interrogation occurred. <u>See</u> ECF Nos. 64-1–

5

64-4.  Scrutchins' statements where he seemingly discussed the robbery and expressed his disbelief at how fast the police responded were spontaneous and in no way elicited through police commentary or questioning.  While officers asked Scrutchins whether he had a gun in his car, these questions were permissible without <u>Miranda</u> warnings to protect the public and police from immediate danger under the public safety exception. <u>See</u> <u>New York v. Quarles</u>, 467 U.S. 649, 657 (1984) ("[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination.").  Moreover, none of Scrutchins' incriminating comments were responsive to questions about the gun.  Scrutchins declined to answer officers' questions about a gun and instead only perfunctorily responded that police would search the car.  Approximately six minutes after officer questioning about the gun, Scrutchins, without prompt, begins to make statements seemingly related to the robbery and about how fast police responded to it.  These statements in no way can be construed as elicited by police questioning—about his gun or otherwise.

Other than questions about Scrutchins' possession of a gun, police only asked Scrutchins questions about his health and comfort and clarifying questions about his unsolicited comments.  For example, when officers were discussing how Scrutchins sped through the welcome center during the car chase, Scrutchins volunteered "y'all sitting right there almost stopped me.  I saw y'all sitting there, and I almost stopped."  ECF No. 64-3 at 2:38.  Confused, an officer asked, "Did we pull out on you?"  <u>Id.</u> at 2:50. Scrutchins responded, "no, y'all didn't pull out, it was two of 'em . . . two cars.  <u>Id.</u> at 2:52.  This conversation, whereby an officer simply requested clarification on Scrutchins'

6

volunteered statements, did not rise to the level of interrogation.  "An officer's attempt to

seek clarification of an ambiguous statement is not generally construed as interrogation

for <u>Miranda</u> purposes if the question does not 'enhance the defendant's guilt or raise the

offense to a higher degree . . . .'"  <u>Butzin v. Wood</u>, 886 F.2d 1016, 1018 (8th Cir. 1989)

(finding that a request for clarification of defendant's remark that he had not been totally

honest did not trigger the need for warnings) (citing W.R. LaFave & J.H. Israel,

1 <u>Criminal Procedure</u> § 6.7, at 514 (1984)); <u>see</u> <u>Rhodes</u>, 779 F.2d at 1032 (finding that an

officer asking "why?" in response to the defendant's spontaneous admission did not

transform the conversation into an interrogation).  Similarly, when an officer responded

"what do you mean?" to Scrutchins' unelicited statements "God he got to me fast! . . . 38

seconds inside, 29 seconds to my car, how the fuck did he get to me that fast?", the

request for clarification did not elevate the conversation to an interrogation.  <u>See</u> ECF No.

64-5 at 12:10–13:45.  Video evidence clearly shows that no police interrogation occurred

during the encounter at issue, and, accordingly, <u>Miranda</u> does not preclude admission of

Scrutchins' statements during that encounter.

Scrutchins alternatively argues that any statements given were not voluntary

because he had just been in a high-speed car crash and had a head injury.  To be sure,

Scrutchins had a cut on his head during the encounter.  However, Scrutchins fails to

explain how this injury impacts the admissibility of any unsolicited statement and

likewise fails to cite any caselaw to support such an argument.  "<u>Miranda</u> protects

defendants against government coercion leading them to surrender rights protected by the

Fifth Amendment; it goes no further than that."  <u>Colorado v. Connelly</u>, 479 U.S. 157, 170

(1986); <u>see id.</u> at 167 ("[C]oercive police activity is a necessary predicate to the finding

that a confession is not 'voluntary' within the meaning of the Due Process Clause of the

Fourteenth Amendment."); United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997)

("The test for determining whether a statement is voluntary under the Due Process Clause

'is whether the [statement] was []extracted by any sort of threats or violence, [or]

obtained by any direct or implied promises, however slight, [or] by the exertion of any

improper influence.'").  As the court explained above, Scrutchins' statements were

unsolicited and not a product of any police coercion.  Therefore, these statements were

not obtained in violation of Miranda, and Scrutchins' head injury does not alter that

analysis.

     In sum, the court finds that Scrutchins' statements were not obtained in violation

of his right against self-incrimination and are admissible.  The motion to suppress

statements is therefore denied.

### B.  Motion to Suppress Evidence

     Scrutchins next moves to suppress all evidence seized pursuant to a state warrant

authorizing a search of Scrutchins' Kia Forte.  Scrutchins argues that the search warrant

is invalid because the supporting affidavit submitted by Detective Crosby relied on three

improper bases to establish probable cause: (1) a warrantless search of the car; (2)

Scrutchins' unwarned custodial statements discussed supra; and (3) false statements and

material omissions of fact by Detective Crosby.  The court discusses each argument in

turn.

### 1.  Warrantless Search of the Car

     Scrutchins first argues that the affidavit improperly included evidence derived

from officers' illegal search of his car—namely officers' opening the trunk without his

consent or a warrant.  Specifically, the affidavit noted that officers observed a backpack

in the trunk, but did not touch it.  It is well-settled that "searches conducted outside the

judicial process, without prior approval by a judge or magistrate, are per se unreasonable

under the Fourth Amendment—subject to only a few specifically established and well-

delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967).  The

government does not dispute that officers opened Scrutchins' trunk without his consent

and without a warrant.  Instead, the government argues that the search of the trunk was

reasonable under three exceptions to the warrant requirement: the automobile exception,

the exigent circumstances exception, and the inventory exception.

### a.  Automobile Exception

In its initial briefing of the motion to suppress evidence, the government did not

argue that the automobile exception applied to the officers' warrantless search.  During

the January 6, 2022 hearing, the court inquired about the applicability of this exception to

the warrant requirement and requested that the parties submit supplemental briefing on

the issue.  Thereafter, the government argued in its supplemental briefing that the

officers' search of Scrutchins' car and trunk was permissible under the automobile

exception.

Searches of cars are one class of situations to which the warrant requirement does

not apply.  Maryland v. Dyson, 527 U.S. 465, 466 (1999) (per curium).  Under the

automobile exception, the police can search a vehicle without first obtaining a warrant if

they have probable cause to believe the car contains contraband or evidence of illegal

activity.  Id. at 467.  The automobile exception permits "the search of every part of the

vehicle and its contents that may conceal the object of the search."  United States v. Ross,

456 U.S. 798, 825 (1982). This includes containers within the vehicle if there is probable cause to believe the object of the search could be found in the container. California v. Acevedo, 500 U.S. 565, 580 (1991). The "ready mobility" of vehicles served as the core justification for the automobile exception for many years. California v. Carney, 471 U.S. 386, 390 (1985) (citing Cooper v. California, 386 U.S. 58, 59 (1967); Chambers v. Maroney, 399 U.S. 42, 51–52 (1970)). Later cases introduced an additional rationale based on "the pervasive regulation of vehicles capable of traveling on the public highways." Carney, 471 U.S. at 392. Therefore, courts have upheld warrantless searches of vehicles where police had probable cause, even when such vehicles were not immediately mobile, based upon the diminished expectation of privacy. See, e.g., United States v. Matthews ("Matthews I"), 32 F.3d 294 (7th Cir. 1994); Carney, 471 U.S. at 391 ("Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception."); South Dakota v. Opperman, 428 U.S. 364, 367 (1976) ("Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.").

Scrutchins argues that the automobile exception does not apply because the Fourth Circuit has not expressly addressed whether a "destroyed and permanently immobile" car can be searched without a warrant when there is probable cause. ECF No. 74 at 3. The court, however, finds the matter well-settled. Numerous courts, including the Fourth Circuit and at least one district court therein, have applied the automobile exception to vehicles that were not immediately mobile. See, e.g., United States v. Kelly,

592 F.3d 586, 590–91 (4th Cir. 2010); United States v. Brown, 2020 WL 6018897, at *5 (W.D. Va. Oct. 11, 2020) (holding that the automobile exception permitted the warrantless search of a vehicle that was wrecked while fleeing police); accord United States v. Mercado, 307 F.3d 1226, 1229 (10th Cir. 2002) (applying the automobile exception to permit the warrantless search of an inoperable vehicle that had been towed to a mechanic's shop for repairs); United States v. Short, 2 F.4th 1076, 1079 (8th Cir. 2021) (finding that a flat tire did not preclude officers from searching vehicle pursuant to the automobile exception); United States v. Maggard, 221 F.3d 1345 (8th Cir. 2000) (applying the automobile exception to a truck that was crashed and stuck in a ditch); Matthews I, 32 F.3d at 299 ("[T]he district court erred when it held that the automobile exception did not apply because the vehicle had lost its mobility."). Scrutchins attempts to distinguish these cases by arguing that those vehicles were only "temporarily immobile" whereas his vehicle was "permanently immobile." ECF No. 74 at 3. The court is unmoved by this argument.

      The Supreme Court has held that the pervasive regulation of automobiles creates a lesser expectation of privacy in those vehicles, Carney, 471 U.S. at 391, and the Fourth Circuit, recognizing this principle, has held that "the justification to conduct a warrantless search under the automobile exception does not disappear merely because the car has been immobilized." Kelly, 592 F.3d at 591 (internal citation omitted). The Fourth Circuit makes no distinction based on whether the automobile has been temporarily or permanently immobilized. As the Fourth Circuit explained, "the exception 'does not have a separate exigency requirement' apart from the inherent mobility of the automobile." Id. at 590 (quoting Dyson, 527 U.S. at 467). This is because "[e]ven in

cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception." Id. at 590–91 (citing Carney, 471 U.S. at 391). Indeed, "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." Id. at 590 (citing Opperman, 428 U.S. at 367). "[U]nlike a home, an automobile ventures out in public" and, "as movable public objects[,] are subject to 'pervasive schemes of regulation.'" Id. (quoting Carney, 471 U.S. at 392). "Thus, reviewing courts need not determine the probability in each case that someone would have driven the car away during the time it would have taken the police to secure a warrant." Id. at 591 (citing Michigan v. Thomas, 458 U.S. 259, 261 (1982) (per curiam)). Instead, the exception applies as long as a car is "readily mobile" in the sense that it is "being used on the highways" or is "readily capable of such use," rather than, say, "elevated on blocks." Id. (citing Carney, 471 U.S. at 392–93, 394 n.3).

Scrutchins' automobile was clearly mobile and being used on the highways and therefore subject to pervasive regulation. Accordingly, he had a lesser expectation of a privacy in his vehicle that justifies application of the automobile exception. Scrutchins' privacy interest in his vehicle did not increase when, after a high-speed chase, he crashed it and rendered it "completely immobile and destroyed." ECF No. 74 at 4. In other words, the fact that Scrutchins destroyed his vehicle during his flight from police did not convert the vehicle from a "movable public object" to a permanently immobile vehicle more akin to a home or office that "harbor[s] personal effects" and "blend[s] the properties of automobiles and residences." Kelly, 592 F.3d at 590. The court is accordingly satisfied that the automobile exception applies to Scrutchins' wrecked and

inoperable vehicle, and officers were permitted to search that vehicle without first

obtaining a warrant if they had probable cause to believe it contained contraband or

evidence of illegal activity.

      In this regard, the court finds that the officers had sufficient probable cause to

search the vehicle.  Probable cause is "not readily, or even usefully, reduced to a neat set

of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983).  However, the Supreme Court

has described it as "existing where the known facts and circumstances are sufficient to

warrant a man of reasonable prudence in the belief that contraband or evidence of a crime

will be found."  Ornelas v. United States, 517 U.S. 690, 696 (1996).  "Probable cause . . .

is not a high bar: It requires only the kind of fair probability on which reasonable and

prudent people, not legal technicians, act.'"  Kaley v. United States, 571 U.S. 320, 338

(2014) (internal citation and quotations omitted).  When assessing probable cause, courts

must examine the facts "from the standpoint of an objectively reasonable police officer,"

giving "due weight to inferences drawn from those facts by . . . local law enforcement

officers."  Ornelas, 517 U.S. at 696, 699.  In this case, officers had probable cause to

believe the car contained evidence of a crime based on Scrutchins' presence in the vacant

lot seconds after a report that the bank robbery suspect had fled to that location,

Scrutchins' subsequent flight when approached by officers, the ensuing car chase, and

Scrutchins' spontaneous incriminating statements immediately after the collision, which

the court has already deemed admissible.

      Officer Lemus arrived at the bank approximately forty-five seconds after the

suspect had fled from the bank on foot.  He was immediately met by the bank manager,

who told Officer Lemus that the suspect was a black male wearing all dark clothing and

that he had fled behind an adjacent vacant building. Officer Lemus arrived in the parking lot of the adjacent vacant building and saw a black male wearing a royal blue button-up shirt and black pants next to a black Kia Forte. At this point, little over a minute had passed since the suspect had fled from the bank in the direction of the vacant building, and this man was the only person in the immediate vicinity. The Kia Forte was parked approximately 424 feet from the front door of the bank. Upon seeing Officer Lemus, the male jumped in his vehicle and fled the parking lot, striking another car in the process. Officer Lemus then pursued the suspect as he drove in excess of 100 miles per hour out of Hardeeville, on to southbound Interstate 95, and into Georgia before crashing into an eighteen-wheeler coming off the Interstate 95 exit into Port Wentworth, Georgia. The male was thereafter identified as Scrutchins, who suggested his involvement in the robbery by way of his own statements. While standing next to his car, Scrutchins made statements seemingly expressing his disbelief at how fast Officer Lemus had responded to the bank robbery and detailing how long it took him to commit the robbery, get to his car, and get out of the state. These statements would leave a reasonable officer with little doubt that Scrutchins was the suspect who had committed the robbery. Accordingly, the court has no difficulty finding that officers had reason to believe evidence of the bank robbery would be found in Scrutchins' vehicle based on the totality of the circumstances. As such, officers were permitted to not only open the trunk, but search Scrutchins' entire vehicle based on the automobile exception.

### b. Exigent Circumstances Exception

Alternatively, the government argues that the search of Scrutchins' trunk was reasonable due to a concern for officer safety. "One well-recognized exception [to the

warrant requirement] applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."  Kentucky v. King, 563 U.S. 452, 460 (2011) (citing Mincey v. Arizona, 437 U.S. 385, 394 (1978)) (internal quotations omitted).  "It is a hallmark of Fourth Amendment jurisprudence that the possibility of a threat to the safety of law enforcement officers may constitute exigent circumstances justifying a warrantless search or seizure."  United States v. Legg, 18 F.3d 240, 244 (4th Cir. 1994); see also United States v. Turner, 650 F.2d 526, 528 (4th Cir. 1981); Warden v. Hayden, 387 U.S. 294, 298–99 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.").  "The rationale underpinning the exigent circumstances doctrine is that when faced with an immediate and credible threat or danger, it is inherently reasonable to permit police to act without a warrant."  United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013).

For police officers to successfully assert the exigent circumstances exception to the warrant requirement, "they need only possess a 'reasonable suspicion' that such circumstances exist at the time of the search or seizure in question."  Figg v. Schroeder, 312 F.3d 625, 639 (4th Cir. 2002) (quoting United States v. Grogins, 163 F.3d 795, 797 (4th Cir. 1998)).  To support this reasonable suspicion, the officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion."  Terry v. Ohio, 392 U.S. 1, 21 (1968).

In determining whether the exigent circumstances exception applies, courts must balance "the societal costs of obtaining a warrant, such as danger to law officers or the

risk of loss or destruction of evidence," against "the reasons for prior recourse to a neutral

magistrate." Arkansas v. Sanders, 442 U.S. 753, 759 (1979), abrogated on other grounds

by Acevedo, 500 U.S. at 565. Courts strike this balance "with due deference for the

difference in perspective between an officer who must make snap judgments in minutes

or seconds, and a judge who has 'the 20/20 vision of hindsight.'" Mora v. City of

Gaithersburg, 519 F.3d 216, 225 (4th Cir. 2008) (quoting Graham v. Connor, 490 U.S.

386, 396 (1989)). And to uphold an officer's actions, courts must find that the officer

acted with objective reasonableness—that "the facts available to the officer at the

moment of the seizure or the search [would] 'warrant a man of reasonable caution in the

belief' that the action taken was appropriate." Terry, 392 U.S. at 21–22 (quoting Carroll

v. United States, 267 U.S. 132, 162 (1925)).

     The court finds that the possibility of a threat to officer safety created exigent

circumstances to justify a warrantless search of the trunk. Joshua Janufka ("Trooper

Janufka"), a Georgia state highway patrolman who was on the scene of the crash,

testified[1] that Scrutchins stated that he did not want to be near the trunk when officers

opened it. Scrutchins confirmed many times during his own testimony that he stated after

the crash that he did not want to be around the trunk or the car and asked the officers to

move him away from both. That Scrutchins made these statements is further

corroborated by video evidence, which shows a Chatham County officer explaining at the

time of the search that "[Scrutchins] said he didn't want to be near that trunk when it

popped." ECF No. 62-2 at 14:20. According to Trooper Janufka, Scrutchins' statements

asking to distance himself from the vehicle caused officers to believe that something in

---

[1] This patrolman was not issued a body camera.

16

the trunk posed a danger to officer safety—whether it was another person, firearms, or explosives.  The court agrees that Scrutchins' statements, in combination with the fact that he and his vehicle had just been involved in a high-speed police chase, were enough for an officer to reasonably infer that something in the trunk presented a danger to officer safety.  Again, officers needed only reasonable suspicion of a threat to officer safety, and "[t]he risk of injury need not be great to create exigent circumstances."  United States v. Jenkins, 426 F. Supp. 2d 336, 343 (E.D.N.C. 2006) (citing United States v. Gwinn, 219 F.3d 326, 333 (4th Cir. 2000)).  The search of the trunk was minimally intrusive; the officers only looked inside the trunk, did not conduct a hand search, and did not open the backpack that was in plain view in the trunk.  In light of the strong governmental interest in guarding police from danger, the diminished expectation of privacy in an automobile, and the deference afforded to officers in making snap judgments, the court finds the officers' opening of the trunk without a warrant was objectively reasonable to guard against danger to the officers.

### c.  Inventory Search Exception

The government additionally argues that opening the trunk was reasonable to conduct an inventory search.  "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage."  Whren v. United States, 517 U.S. 806, 811 n.1 (1996).  Vehicle inventory searches are a well-recognized exception to the Fourth Amendment warrant requirement.  See, e.g., Florida v. Wells, 495 U.S. 1 (1990); Colorado v. Bertine, 479 U.S. 367 (1987); Opperman, 428 U.S. at 364; United States v. Matthews (Matthews

17

II), 591 F.3d 230 (4th Cir. 2009); United States v. Murphy, 552 F.3d 405 (4th Cir. 2009). While not dependent on probable cause, however, vehicle inventory searches must be conducted according to standard operating procedure.  See, e.g., Wells, 495 U.S at 4–5; Bertine, 479 U.S. at 371–372; Matthews II, 591 F.3d at 235; Murphy, 552 F.3d at 412–413.

  While police do not need a warrant to conduct an inventory search, the government has not persuasively shown that the trunk was opened for the purpose of taking inventory.  The only video evidence indicating that the trunk was opened to take inventory of its contents is one officer's post-hoc justification of the search.  Specifically, when an officer was told in a phone call to not search the car, close the trunk, and secure the vehicle, another deputy overhearing the call responded, "We opened the trunk to inventory it because we did not know what was going on, so if they say something tell them to call me, and I'll take care of it."  ECF No. 63-2 at 20:12–21:33.  The officers do not discuss the need to take inventory before opening the trunk or while conducting that search, and the government has not produced any documentation to show that inventory was, in fact, taken of the contents in Scrutchins' vehicle at the time of the challenged search.  To the contrary, Trooper Janufka testified that officers did not document any of the contents of Scrutchins' vehicle while on the scene of the crash.  The government has likewise not argued or shown that any inventory allegedly taken was conducted according to standard operating procedure.  Therefore, the court cannot be sure that the officers' on-scene search of the Scrutchins' vehicle qualifies as a reasonable inventory search.

  Nevertheless, the court finds that an inventory of Scrutchins' vehicle would have inevitably been taken, and evidence in the trunk inevitably discovered, pursuant to the

Hardeeville Police Department's tow and impound policy. The United States Supreme Court has recognized "the ultimate or inevitable discovery exception to the exclusionary rule," which applies when "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444 (1984). Those lawful means include an inventory search. See, e.g., United States v. Ibarra, 955 F.2d 1405, 1410 (10th Cir. 1992) ("[I]f evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible.").

According to Detective Crosby's affidavit, Scrutchins' vehicle was towed to the Hardeeville Police Department and securely stored inside. Scrutchins does not dispute that police needed to tow and impound his vehicle or that officers were permitted to conduct a lawful inventory search of his vehicle under the Hardeeville Police Department's tow and impound policy. Officer body and dash camera videos clearly show that Scrutchins' vehicle was a traffic hazard and blocking the roadway. The videos further show that the airbags in his vehicle deployed, and Scrutchins concedes that the vehicle was inoperable. Because Scrutchins was arrested and his vehicle wrecked, the police needed to tow and impound the vehicle. Moreover, the applicable tow and impound policy requires officers to complete a tow inventory sheet and conduct an inventory of the entire vehicle in accordance with department procedures. ECF No. 62-6. It is clear to the court, then, that the evidence in Scrutchins' car, including evidence that Scrutchins had a black backpack in his trunk, would inevitably have been discovered during the course of a lawful inventory search. Therefore, the exclusionary rule does not apply to evidence obtained from opening the trunk, and the search warrant is not

invalidated as fruit of the poisonous tree just because Detective Crosby included such evidence in his affidavit.

In sum, the court finds that the warrantless search of Scrutchins' vehicle was permissible under the automobile exception, the officer safety exception, and the inevitable discovery exception.[2]  Therefore, the court holds that evidence discovered in executing the search warrant need not be suppressed as fruit of a poisonous, illegal search of the trunk.

### 2.  Unwarned Custodial Statements

Scrutchins next contends that the affidavit is defective because it relies on his unwarned, custodial statements.  There are two fatal flaws in Scrutchins' argument.  First, the court, for reasons explained above, has determined that Scrutchins' statements were not obtained in violation of his Miranda rights.  Second, even if the court had reached the opposite conclusion, "[w]hen a statement is suppressed because of a Miranda violation, it does not follow that any physical or derivative evidence discovered as a result of the statement should also be suppressed."  United States v. Windham, 362 F. Supp. 3d 310, 318–19 (D.S.C. 2019).  In other words, the "fruit of the poisonous tree" doctrine does not require suppression of physical or derivative evidence discovered as a result of unwarned custodial interrogation.  See United States v. Sterling, 283 F.3d 216, 218–19 (4th Cir.

---

[2] Even if the three exceptions did not apply such that opening the trunk constituted an illegal search, the inclusion of allegedly "tainted" evidence does not invalidate the warrant when the affidavit's other averments set forth probable cause. United States v. Gillenwaters, 890 F.2d 679, 681 (4th Cir. 1989) (citing United States v. Whitehorn, 813 F.2d 646, 649, n.3 (4th Cir. 1987), cert. denied, 487 U.S. 1234 (1988)). As the court explains infra in footnote 4, evidence of the backpack in the trunk is not necessary to the warrant's probable cause determination, and this provides an alternative, independent ground for rejecting Scrutchins' argument.

2002) (affirming admission of derivative evidence discovered as a result of unwarned, custodial statements and holding the "fruits doctrine" inapplicable to <u>Miranda</u> violations), <u>cert. denied</u>, 536 U.S. 931 (2002); <u>see also</u> <u>United States v. Elie</u>, 111 F.3d 1135 (4th Cir. 1997); <u>accord</u> <u>United States v. Patane</u>, 542 U.S. 630, 634–44 (2004) (noting, in resolving a circuit split on this issue in favor of the Fourth Circuit rule, that "the exclusion of unwarned statements is a complete and sufficient remedy for any perceived <u>Miranda</u> violation" (internal quotation marks and citations omitted)).  Therefore, Scrutchins' unwarned custodial statements were properly included in Detective Crosby's affidavit to support probable cause for a search warrant.  Evidence obtained from that search warrant need not be suppressed just because it was derived in part from those statements.

### 3.  False Statements and Material Omissions

Scrutchins further requests a hearing on the validity of the search warrant pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) on the grounds that Detective Crosby's affidavit relied on false statements and omissions of fact that were material to the probable cause determination.  The court addresses these allegedly false statements and omissions in turn below.

### a.  False Statements

Scrutchins contends that the affidavit is defective due to four false statements included therein: (1) that Scrutchins stated he "was not responsible for what was in the trunk of the car"; (2) that officers opened the trunk "to check the vehicle for other suspects"; (3) that the officers opened the trunk "for officer safety"; and (4) that "[o]nce the vehicle crashed, [Scrutchins] attempted to flee the scene."  ECF No. 57 at 8–9.

"An accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." United States v. Allen, 631 F.3d 164, 171 (4th Cir. 2011). A Franks hearing provides a criminal defendant with a narrow way to attack the validity of an affidavit. But to obtain the hearing, a defendant must make a "substantial preliminary showing" that (1) law enforcement made "a false statement"; (2) the false statement was made "knowingly and intentionally, or with reckless disregard for the truth"; and (3) the false statement was "necessary to the finding of probable cause." United States v. White, 850 F.3d 667, 673 (4th Cir. 2017) (quoting Franks, 438 U.S. at 155–56). Given the "presumption of validity with respect to the affidavit supporting the search warrant," Franks, 438 U.S. at 171, a defendant must satisfy this "heavy" burden before a hearing takes place. United States v. Tate, 524 F.3d 449, 454 (4th Cir. 2008).

The first required showing, falsity, cannot be conclusory and must rest on affidavits or other evidence. See Franks, 438 U.S. at 171; United States v. Clenney, 631 F.3d 658, 663 (4th Cir. 2011). As a result, the defendant cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts. Rather, there must be evidence showing that the statements at issue are objectively false. "[M]ere desire to cross-examine" a police officer is not enough. Franks, 438 U.S. at 171; see United States v. Kent, 652 F. App'x 161, 166 (4th Cir. 2016).

The second showing, intentional falsity or reckless disregard for the truth, is just as demanding. An innocent or even negligent mistake by the officer will not suffice. Franks, 438 U.S. at 170; United States v. Lull, 824 F.3d 109, 115–16 (4th Cir. 2016). And here too, the defendant must provide facts—not mere conclusory allegations—

indicating that the officer subjectively acted with intent to mislead, or with reckless disregard for whether the statements would mislead, the magistrate.  See United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990).

Finally, the defendant must make a third showing of materiality—that is, that the false statements were "necessary to the finding of probable cause."  Franks, 438 U.S. at 156; United States v. Wharton, 840 F.3d 163, 168 (4th Cir. 2016).  A district court may not hold a Franks hearing where, after stripping away the allegedly false statements, the truthful portions of the warrant application would still support probable cause.  This limitation reflects the ultimate purpose of Franks: "to prevent the admission of evidence obtained pursuant to warrants that were issued only because the issuing magistrate was misled into believing that there existed probable cause."  United States v. Friedemann, 210 F.3d 227, 229 (4th Cir. 2000).

To begin, the court does not find that Scrutchins has satisfied the first and second prongs under Franks—falsity and intent to mislead—with respect to the four allegedly false statements in the affidavit.  As the court discussed above, Scrutchins testified that he stated multiple times at the scene of the crash that he did not want to be near the trunk, and Trooper Janufka testified that these statements caused officers to be concerned for their safety and search the vehicle and its trunk for dangers, including firearms, explosives, or another person.  Therefore, the court does not find that the first three complained-of statements are objectively false or were included with the intent to mislead.[3]  Rather, the evidence is fully compatible Detective Crosby's statements in his

---

[3] Scrutchins argues that there is a significant difference between stating that he was not responsible for what was in the trunk of the car and stating that he did not want to be near the trunk when opened.  He explains that the statement "I am not responsible

affidavit that Scrutchins said he "was not responsible for what was in the trunk of the car"; that officers opened the trunk "to check the vehicle for other suspects"; and that the officers opened the trunk "for officer safety." ECF No. 57-1 at 5. Although there is less evidence on whether Scrutchins attempted to flee the scene after his crash, Scrutchins has also not made a substantial showing that the fourth challenged statement is objectively false or was made with intent to mislead. Detective Crosby testified that, in including the statement that Scrutchins attempted to flee the scene after the crash, he relied on information relayed to him by Officer Lemus and a Hardeeville Police Department officer, Steven Thomas ("Thomas"), who both responded to the crash. Detective Crosby testified that he had known and worked closely with both officers for many years and had no reason to disbelieve either. Scrutchins also testified that he had at least one hand outside of the vehicle after the crash and could not recall whether he also had a foot outside of the vehicle. The dash and body camera videos show that Scrutchins' car door was open and both of his hands, one leg, and his head were out of the vehicle after the crash when officers approached him at gunpoint and instructed him not to move. A reasonable officer in that situation could have interpreted Scrutchins' positioning as

_____

for what is in the trunk" suggests knowledge about what is in the trunk. ECF No. 74 at 2. He claims that his statement that he did not want to be near the trunk when opened, on the other hand, was merely an expression of his fear of being shot due to any misunderstanding or commotion if he remained in the vicinity of his vehicle. The court does not find this difference relevant to the probable cause determination. Both statements would suggest to a reasonable officer that either contraband or evidence of a crime were in the trunk—whether intended to or not. Moreover, Detective Crosby stated in his affidavit that "Lieutenant Thomas advised suspect SCRUTCHINS made a statement to the officers in Georgia that he was not responsible for what was in the trunk of the car." ECF No. 57-1 at 5. The court finds it entirely implausible that Detective Crosby knew this statement was false but included it anyways because he believed it supported probable cause more than Scrutchins' admitted statement that he did not want to be near the trunk when officers opened it.

indicative of his attempt to flee—particularly in the context of the high-speed police chase immediately preceding this encounter.  In any event, the court need not conclusively determine whether Scrutchins did in fact attempt to flee after the crash because the government is not required to prove the truth of the challenged statement; it is Scrutchins' burden to prove intentional falsity.  Even if Scrutchins did not attempt to flee after the crash, the court has no evidence to support a finding that Detective Crosby included the statement with intent to mislead, rather than due to an innocent or negligent mistake.  Indeed, Detective Crosby testified that while he requested to review officer dash and body camera footage to confirm the information he received before preparing his affidavit, he did not have the technical capability to do so until the videos were fully downloaded at a later date.  Overall, the court does not find that Detective Crosby acted with deceptive intent or recklessly in including any statements in his affidavit.  At best, Scrutchins has demonstrated his mere subjective disagreement with the characterization of the facts in Detective Crosby's statements, but that disagreement falls far short of the requisite substantial preliminary showing necessary to obtain a Franks hearing.

Even if Scrutchins satisfied the first and second prongs, he would still not be entitled to a Franks hearing because he clearly fails to make a sufficient showing at the third prong—materiality.  In other words, even if the affidavit were purged of these allegedly false statements, the affidavit would still be supported by probable cause. As previously noted, probable cause to search "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found" in a particular place.  Ornelas, 517 U.S. at 696.  Again, probable cause is not a high bar.  Kaley, 571 U.S. at 338.  The magistrate

must "simply [ ] make a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois, 462 U.S. at 214.  The primary consideration in determining whether probable cause exists is "whether it is reasonable to believe that the items seized will be found in the place to be searched."  United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993).  Reviewing courts give wide deference to probable cause determinations made by magistrates.  United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994).

Detective Crosby's affidavit in support of the warrant stated that an armed robbery suspect was reported to have fled behind a certain vacant building.  It sets forth that Officer Lemus saw a man behind that building seconds after the report, and this man fled in a black Kia Forte when Officer Lemus attempted to speak with him.  It notes that Officer Lemus pursued the Kia Forte in a car chase, that the Kia Forte crashed while exiting Interstate 95, and that the driver of the Kia Forte that crashed was identified as Scrutchins.  The affidavit further provides that Scrutchins stated, "I don't know how they got to me so fast!" after the crash.[4]  ECF No. 57-1 at 4.  It also points out that the robbery

_____

[4]As the court has explained, the fruits of the search warrant should not be suppressed simply because the unwarned custodial statements or observations of the backpack were included in the supporting affidavit.  See Patane, 542 U.S. at 634–44 ("[T]he exclusion of unwarned statements is a complete and sufficient remedy for any perceived Miranda violation."); Ibarra, 955 F.2d at 1410 ("[I]f evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible.").  As a practical matter, then, it would make little sense to exclude this information in considering probable cause in the context of the instant materiality determination.  In any event, even if the court ignored the unwarned custodial statements and the backpack in its consideration, the court would still find probable cause to search the Kia Forte based on Scrutchins' suspicious flight in that vehicle from the area where an armed robbery suspect had been reported to be located seconds earlier.  See, e.g., United States v. Bell, 594 F. App'x 771, 773 (4th Cir. 2014) (finding that arrest

suspect wore a backpack, and a backpack was seen in the trunk of Scrutchins' Kia Forte. Based on this information and applying common-sense to the totality of the circumstances, it was more than reasonable for Judge Mullen to believe that contraband or evidence of the armed robbery would be found in the Kia Forte. Therefore, even if the four allegedly false statements were removed, the affidavit would still be sufficient for a finding of probable cause. Because the affidavit would provide adequate support for a finding of probable cause without the allegedly false statements, the court cannot say that these statements were "material" under the second Franks prong. Therefore, Scrutchins has failed to show that he is entitled to a Franks hearing based on these alleged falsities.

### b. Material Omissions

Finally, Scrutchins argues that he is entitled to a Franks hearing because material facts were omitted from the affidavit. These allegedly material omissions include (1) that Officer Lemus had lost sight of the car he was pursuing for at least five minutes; and (2) Officer Lemus had pulled over a blue Toyota "right after the exit." ECF No. 57 at 9. The court does not find that either of these alleged omissions warrant a Franks hearing.

When relying on an omission, rather than on a false affirmative statement, Scrutchins' burden increases even further. See Colkley, 899 F.2d at 301. As the Fourth Circuit explained in Colkley, an affidavit offered to procure a search warrant "cannot be expected to include . . . every piece of information gathered in the course of an

_____

was supported by probable cause based on defendant's attire, demeanor, and flight from the area shortly after the robbery); United States v. Martinez-Molina, 64 F.3d 719, 730 (1st Cir. 1995) (considering flight of suspects from area where suspected cocaine transaction occurred in finding probable cause to search a vehicle). A person of reasonable caution would believe, based on these facts, that the vehicle contained contraband or evidence of the armed robbery.

investigation." Id. at 300.  And because every piece of information cannot be expected to be included, the very process of selecting facts to include for the demonstration of probable cause must also be a deliberate process of omitting pieces of information. Certainly, such intentional omissions do not satisfy the requirement of Franks.  "If, as the district court held, this type of 'intentional' omission is all that Franks requires, the Franks intent prerequisite would be satisfied in almost every case."  Id.  Accordingly, merely showing an intentional omission of a fact from a warrant affidavit does not fulfill the Franks requirements.  See id. at 301; United States v. Shorter, 328 F.3d 167, 170–71 (4th Cir. 2003).  Therefore, to satisfy the Franks intentional or reckless falsity requirement for an omission, the defendant must show that facts were omitted "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading."  Colkley, 899 F.2d at 300 (internal quotation marks omitted).  Stated otherwise, the omission must be "designed to mislead" or must be made "in reckless disregard of whether [it] would mislead."  Id. at 301 (emphasis in original).  The relevance of the omission comes into play in this analysis: the significance—or insignificance—of a particular omission to the determination of probable cause informs a court's conclusion regarding the agent's intent.  Lull, 824 F.3d at 117.  To be material under Franks, an omission "must be such that its inclusion in the affidavit would defeat probable cause."  Colkley, 899 F.2d at 301.

Scrutchins fails to make a substantial showing that Detective Crosby had an intent to mislead when he omitted from his affidavit that officers lost sight of the Kia Forte during the car chase and once pulled over a wrong vehicle during their pursuit.  Detective Crosby was not expected to include every piece of available information in his affidavit,

and these detailed facts about the car chase were relatively insignificant in light of the facts discussed supra that supported probable cause. Colkley, 899 F.2d at 301 ("Omitted information that is potentially relevant but not dispositive is not enough to warrant a Franks hearing."). The Fourth Circuit has noted in dicta that it has "doubts about the validity of inferring bad motive under Franks from the fact of omission alone, for such an inference collapses into a single inquiry the two elements—'intentionality' and 'materiality'—which Franks states are independently necessary." Id. This court likewise will not infer that Detective Crosby had a nefarious motive in excluding this information from his affidavit without any evidence beyond the mere fact of the omission. Scrutchins does not provide any evidence tending to show that Detective Crosby believed that inclusion of these facts would defeat a probable cause determination and omitted those facts to achieve that result. On the contrary, Detective Crosby testified that he omitted these facts because he did not find them relevant. Regardless, the court affirmatively finds that the affidavit would be supported by probable cause even if it included the alleged omissions. In other words, the omitted information is not material to the probable cause determination. To the extent this information has exculpatory value in undercutting the officers' identification of Scrutchins and his Kia Forte as the person and vehicle that fled the scene of the robbery, it is not enough to defeat probable cause when weighed against other evidence connecting Scrutchins and his vehicle to the armed robbery. A defendant must meet a high bar before he may challenge the veracity of a facially valid search warrant affidavit. Each of Scrutchins' arguments fails to clear that bar. Because Scrutchins has failed to make a sufficient showing to justify a hearing under Franks, the court denies Scrutchins' request for the same.

### III.   CONCLUSION

For the reasons set forth above, the court **DENIES** both the motion to suppress

statements and the motion to suppress evidence.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**February 7, 2022**
**Charleston, South Carolina**